669 P.2d 68

**STATE of Arizona, Appellee,**

v.

**Dennis Earl ROUTHIER, Appellant.**

**No. 5390.**

Supreme Court of Arizona,
En Banc.

July 6, 1983.

Rehearing Denied Sept. 13, 1983.

Robert K. Corbin, Atty. Gen. by William J. Schafer III, Gerald R. Grant, Asst. Attys. Gen., Phoenix, for appellee.

Ross P. Lee, Maricopa County Public Defender by Robert D. Bohm, Terry J. Adams, Phoenix, for appellant.

HOLOHAN, Chief Justice.

A jury found appellant, Dennis Earl Routhier, guilty of first degree murder and attempted first degree murder. He was sentenced to death on the first degree murder charge and to 21 years on the charge of attempted first degree murder. Appellant appeals these convictions and sentences. We have jurisdiction of this case pursuant to Arizona Const. art. 6 § 5 and A.R.S. § 13–4031.

The appellant raises seven issues on appeal but we believe the answers to the following questions will be dispositive of the appeal:

1. Whether the scope of the prosecutor's cross-examination of the appellant violated his fifth and fourteenth amendment rights.
2. Whether photographs of the deceased and a bloody shirt were erroneously admitted into evidence.
3. Whether the trial court erred in not granting appellant's motion for acquittal on the count of attempted murder.

The following facts are necessary for a resolution of the issues presented.

On the morning of September 20, 1980, Lawrence Barrick and his son, Robert, stopped the vehicle in which they were travelling to aid a man who had flagged them down. Dennis Earl Routhier, appellant, told the Barricks he was having trouble with his truck. The Barricks drove the appellant to his truck, which was parked some distance off the main road. When the three men arrived at the truck, a '56 Chevy, the appellant stated he would make one more attempt to start it. The truck started unaided. The three men then sat on the tailgate of the Barricks' truck and drank some beer.

After finishing their beer, the Barricks drove to a friend's house. The appellant was invited to follow them in his own truck, and he did. The Barricks' friend was not at home so they decided to drive out to Roosevelt irrigation canal and take a swim. The appellant followed the Barricks to the canal.

Robert Barrick jumped into the canal and swam for five to ten minutes. As Robert began to climb out of the canal, the appellant approached him and hit him in the head with a hammer. Robert was cut and knocked unconscious for a few seconds. He testified that appellant asked him if he had any money, to which Robert replied "No." Appellant then instructed Robert to get out of the canal or his father would be harmed. At this point Robert noticed that his father was slumped over on the ground by his truck. Robert climbed the opposite bank of the canal and ran to the nearby freeway to summon help.

Meanwhile, the appellant sped away in his truck. When the police arrived at the scene, they found Lawrence Barrick beaten and bleeding profusely from the head and neck. He died soon afterwards. Medical testimony revealed that he died of multiple wounds inflicted by a blunt instrument.

Later that afternoon, police apprehended the appellant after a high speed chase on the freeway. The chase terminated when the appellant's truck swerved into a semi-truck and rolled off the freeway. The appellant was taken into custody and admitted to Good Samaritan Hospital for treatment of head and leg injuries.

Appellant's testimony at trial was that he killed Lawrence Barrick in self-defense. He claimed that Barrick attacked him without reason and appellant only used his hammer when Barrick tried to gouge his eye out. Additional facts pertinent to questions raised by the appellant will be discussed as necessary.

## HOSPITAL STATEMENTS

On the morning of September 21, 1980, Detective Barber of the Phoenix Police Department visited the appellant at Good Samaritan Hospital. The appellant was informed of his rights to silence and to the services of an attorney. He stated that he understood his rights and was willing to submit to questioning. Appellant signed a waiver of rights card, and the interrogation began. During the interrogation the appellant indicated that he remembered meeting an old man and his son, having a disagreement with the old man and hitting both individuals with his fists. When asked by Detective Barber whether he had used a hammer, the appellant stated that he may have been mad enough to use one, but he did not believe that he had. Detective Barber then asked the appellant to elaborate on specific details, but the appellant stated

that he wanted to speak with an attorney. At that point, the questioning ceased.

Three days after the first interview at Good Samaritan Hospital, before counsel had been provided him, the appellant was interrogated a second time by a Detective Locksa. The interrogation was conducted at the detention ward of Maricopa County Hospital, where the appellant had been transferred from Good Samaritan Hospital. Detective Locksa had been advised by Detective Barber of the appellant's previous request for counsel. The appellant was again informed of his rights to silence and legal representation. Detective Locksa further told the appellant that he did not want to discuss the Barrick homicide but that he wanted to discuss two unrelated homicide cases. The appellant stated that he was willing to talk to the detective. In response to Detective Locksa's questions regarding these unrelated homicides, the appellant implicated himself in the Barrick homicide. His precise words were, "I have never done anything like this before. The only reason I did what I did is that I was totally shit-faced, I probably would not have even hit the old man if it hadn't been for his big mouth."

The appellant was charged by indictment with having committed first degree murder and attempted first degree murder. Subsequently, pursuant to a plea agreement, the appellant appeared before the superior court to enter a no contest plea. At the hearing on the no contest plea a set of police reports and the medical examiner's report were admitted into evidence to establish a factual basis for the plea.

Before the plea was accepted by the superior court, the appellant asked to withdraw the plea. The request was granted, and the case was transferred to another superior court judge.

Prior to trial, the appellant moved to suppress all of his hospital statements[1] on the grounds that they were involuntary due to appellant's physical condition at the time of interview. No mention was made of the appellant's request for counsel in his motion to suppress or at the voluntariness hearing. Both Detectives Barber and Locksa testified at the voluntariness hearing and neither one mentioned the appellant's request for counsel. The appellant's motion to suppress his statements was denied. The trial court found that the statements were voluntarily made after the appellant had waived his constitutional rights.

At trial, when the appellant was being cross-examined, the fact of his request for counsel was brought out by the prosecution. At that point defense counsel made a motion to preclude any questioning of the appellant regarding statements made by him during the second interview on the grounds of inadequate showing of Miranda[2] compliance. The trial judge denied the motion stating that he had already ruled that the statements were voluntary and admissible. Defense counsel, however, did not make any motion concerning the cross-examination of appellant on matters to which he had invoked his right to silence and counsel.

The prosecutor then questioned the appellant on the substance of his incriminating statement to Detective Locksa. Specifically, the prosecutor read the statement in court and asked the appellant if he remembered making it. The appellant stated he did not remember making such a statement.

Detective Barber was recalled by the state in rebuttal, and he testified that the appellant had invoked his right to counsel during the first interview at Good Samaritan Hospital and that he told Detective Locksa before Locksa interviewed the appellant a second time, that the appellant had previously invoked his right to counsel. Detective Locksa testified that Detective Barber had, in fact, informed him that the appellant requested an attorney when Barber was interviewing the appellant.

---

1. Those made during the first interview at Good Samaritan Hospital to Detective Barber and those made during the second interview at the County Hospital to Detective Locksa.

2. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Appellant challenges the admission of his hospital statements.

### THE DOYLE ISSUE

The appellant argues that he was denied due process by the prosecutor's reference to his post-arrest silence. During cross examination of appellant the following testimony was elicited.

Q. [by the prosecutor] But you don't remember that you had told them that it was possible that you used a hammer?

A. Oh, yes, I think I might have told them it was possible I might have.

Q. But you didn't tell them that the man had been gouging your eye out, did you?

A. I don't recall. I don't think so. I don't think I'd want to tell them that.

Q. Why not?

A. Well, after I found out where I was and what I was—you know, the situation I was in, I wanted to speak to a lawyer. I do recall asking him that or telling him that—not him, but the other officer I talked to. I do recall saying I'd just as soon speak to an attorney, yes. I did hit the man, that's all I recall saying. However I put it, that's exactly what I meant out of it was, yes, I did hit the man, and, yes, I'd like to see an attorney. They proceeded asking questions after I told them I wanted to see an attorney and kept on and on. What they got off that, I don't know. I'm sure it was just, you know, to show them that I was not gonna talk anymore.

Q. But at that time you at no point mentioned any kind of self-defense?

A. I don't think so. No, I didn't discuss any of the details with them.

The State also brought out in its case in chief on redirect examination of Detective Barber the following:

Q. BY MR. HOTHAM [the prosecutor]: Mr. Bohm [defense counsel] asked you whether it wasn't a fact that the defendant admitted to you that he had struck an older man and a younger man, is that correct?

A. That's correct.

Q. The—did the defendant tell you anything about the victim coming at him?

A. The defendant made no mention at all of the victim attacking him or approaching him in any manner to me.

Q. Did he tell you anything about the victim threatening him?

A. No, he did not.

Q. Did he tell you anything about the victim having a gun?

A. No, he did not.

Q. All he stated to you was that he remembers striking both the older man and the younger man, but thought it was with his fists, and then he might have been mad enough to pick up a hammer, but he did not recall doing that; is that correct?

A. That's correct.

█ Initially, we note that defense counsel made no objection to any of the questioning now being challenged. Although objection is usually required to preserve a question for appeal, an objection is not necessary in the case of fundamental error. *State v. Navarre*, 132 Ariz. 480, 647 P.2d 178 (1982). Because appellant asserts that fundamental error was committed in this case and we are obligated to review the record for such error, *State v. Post*, 121 Ariz. 579, 592 P.2d 775 (1979), we address appellant's contention that his post arrest right to silence was violated.

The United States Supreme Court has ruled that a defendant cannot be impeached by his post-arrest silence after being read his *Miranda* warnings. *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *see Fletcher v. Weir*, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982). This ruling is consistent with Arizona case law which has established that a defendant's silence at the time of arrest cannot be used against him as inconsistent with testimony given at trial. *State v. Anderson*, 110 Ariz. 238, 517 P.2d 508 (1973); *State v. Shing*, 109 Ariz. 361, 509 P.2d 698 (1973); *see State v. Ward*, 112 Ariz. 391, 542 P.2d 816 (1975). These decisions are grounded on the principle that the *Miranda* warnings implicitly

assure a person that the exercise of his rights carries no penalty and cannot be used against him. *See Doyle v. Ohio, supra.*

█ The State argues that the above rationale does not apply in this case because appellant waived his constitutional rights. While it might be true that appellant signed a waiver of rights card at the beginning of the interview with Detective Barber, appellant was not inextricably bound by that waiver. As stated in *Miranda:*

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.
>
> \*     \*     \*     \*     \*     \*
>
> Moreover, where in-custody interrogation is involved, there is no room for the contention that the privilege is waived if the individual answers some questions or gives some information on his own prior to invoking his right to remain silent when interrogated.

*Miranda v. Arizona,* 384 U.S. at 473–74, 475–76, 86 S.Ct. at 1627–1628.

In this case it is clear that, although appellant initially waived his rights, he subsequently reinvoked those rights by requesting an attorney. Detective Barber in fact testified that he understood appellant was invoking his rights and ceased questioning. Appellant's express invocation of his rights, as well as his failure to make a complete statement or to answer particular questions, distinguishes this case from, e.g., *State v. Reinhold,* 123 Ariz. 50, 597 P.2d 532 (1979); *State v. Tuzon,* 118 Ariz. 205, 575 P.2d 1231 (1978) and *State v. Raffaele,* 113 Ariz. 259, 550 P.2d 1060 (1976). While it was permissible for the prosecutor to question the appellant and Detective Barber on matters which the appellant had volunteered prior to reinvoking his rights, it was impermissible to ask questions on matters about which the appellant had not made any comment or given any information. In

doing so, the State violated appellant's fifth amendment right to silence.[3]

## FUNDAMENTAL ERROR

Since the violation of appellant's constitutional rights constituted fundamental error, the remaining issue is whether the error was harmless. *State v. Anderson, supra.* From a review of the record we cannot say that the error was harmless beyond a reasonable doubt.

Since the case must be retried it is necessary to address several issues.

## THE SECOND STATEMENT

The incriminating remarks to Detective Locksa were not offered in the state's case in chief. The statement was brought out by the state in its cross-examination of the defendant. Since no cautionary instructions were given by the trial judge, the jury was free to consider the statement of appellant to Locksa as evidence of guilt.

Appellant argues that the testimony of Detective Locksa should not have been admitted because it was obtained after the appellant had requested the assistance of counsel. The appellant relies on *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

The State contends, however, that *Edwards v. Arizona, supra,* is inapplicable to the case at bar. It argues that *Edwards* only spoke to waiver of counsel pursuant to reinterrogation on the same offense, whereas the appellant in the instant case was reinterrogated on other matters.

The precise issue that this court must decide is whether appellant's fifth and fourteenth amendment rights were violated when he was questioned about two unrelated homicides after having asserted a right to counsel incident to the Barrick homicide. We decide today the issue left open in *State v. Hensley,* No. 5556, 669 P.2d 58 (Ariz. filed June 30, 1983).

The State argues that *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313

---

**3.** Because we are remanding for a new trial, we do not feel it is necessary to analyze the refer-

ences made to appellant's silence in the prosecutor's closing argument.

(1975), controls this issue. In *Mosley,* the U.S. Supreme Court considered the propriety of questioning a suspect about one crime after the suspect had invoked his right to remain silent when he was questioned earlier about an unrelated crime. The Court held that a reinterrogation is not a violation of a suspect's fifth amendment right to silence where the invocation of that right is "scrupulously honored." *Id.,* at 104, 96 S.Ct. at 326. The Court found that the resumption of interrogation about an unrelated offense was not inconsistent with Mosley's earlier refusal to answer any questions. *Id.* at 105, 96 S.Ct. at 327.

*Michigan v. Mosley, supra,* however, did not address the procedures to be followed after a defendant invokes his right to counsel. The majority opinion in *Mosley* meticulously distinguished the right to silence from the right to counsel: "The present case does not involve the procedures to be followed if the person in custody asks to consult with a lawyer, since Mosley made no such request at any time." *Id.,* at 101, n. 7, 96 S.Ct. at 325. And again: "[T]he Court in *Miranda* ... distinguished between the procedural safeguards triggered by a request to remain silent and a request for an attorney and directed that 'the interrogation must cease until an attorney is present' only '[i]f the individual states that he wants an attorney. 384 U.S. at 474, 86 S.Ct. 1628.'" *Id.* at 104, n. 10, 96 S.Ct. at 326.

The procedures governing the reinterrogation of a suspect after he invokes his right to counsel were detailed by the Supreme Court in *Edwards v. Arizona, supra.* In *Edwards,* the defendant was reinterrogated after previously invoking his right to counsel in an earlier interview. The Supreme Court determined that Edwards' confession, given during the second custodial interrogation, was inadmissible. The court stated:

we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police. 451 U.S. at 484–85, 101 S.Ct. at 1884–1885 (footnote omitted).

The only difference between Edwards and the appellant is that Edwards was questioned about the same offense after a request for counsel while the appellant was reinterrogated about an unrelated offense. We do not believe that this factual distinction holds any legal significance for fifth amendment purposes.

■ The language of *Edwards* is unequivocal; an accused who has asserted his right to counsel "is not subject to further interrogation by the authorities until counsel has been made available to him." 451 U.S. at 485, 101 S.Ct. at 1885. The rule prohibits "further interrogation." Nowhere in *Edwards* does the majority indicate that reinterrogation of the accused is permissible if the authorities merely shift the line of questioning to other matters or unrelated offenses. Such a rule would render the *Edwards* opinion meaningless and invite the ingenious officer to invent new schemes to produce colorable waivers of the fifth amendment rights.

■ The assertion of the right to counsel is an expression by the accused that he is not competent to deal with the authorities without legal advice.[4] See *Edwards v. Arizona, supra.* The resumption of ques-

---

4. In contrast, the U.S. Supreme court has stated that the assertion of the right to silence is merely an expression of the accused's desire to cut off questioning with respect to a specific subject. The lines of communication between the accused and the authorities remain open, as the accused has chosen to make his own decisions in regards to future police interrogation. *See Michigan v. Mosley, supra.*

tioning in the absence of an attorney after an accused has invoked his right to have counsel present during police interrogation strongly suggests to an accused that he has no choice but to answer. Thus, "a later decision at the authorities' insistence to make a statement without counsel's presence may properly be viewed with skepticism." *Michigan v. Mosley,* 423 U.S. at 111, n. 2, 96 S.Ct. at 329 (White, J., concurring).

■ We therefore hold that, after requesting counsel during the initial interrogation, the appellant should not have been subjected three days later to interrogation which he did not initiate, without counsel having been made available to him.

Regarding the statement to Locksa, we note that it was admitted as impeachment evidence on cross examination of the appellant rather than in the State's case in chief. In *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), the U.S. Supreme Court held that a *Miranda* violative statement that is inadmissible against a defendant in the prosecution's case in chief, may, if its trustworthiness satisfies legal standards, be used for impeachment purposes to attack the credibility of the defendant. The State contends that the remarks to Locksa were properly admitted to attack the appellant's credibility by cross-examining him on the inconsistencies between his hospital statement to Detective Locksa and his statements at trial.

In *State v. Swinburne,* 116 Ariz. 403, 569 P.2d 833 (1977), we stated:

In *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975), the Supreme Court held admissible for impeachment purposes inculpating post-arrest statements of the defendant made after he had been given his *Miranda* rights and exercised his right to request a lawyer, but before he had been furnished with counsel. The court said that evidence which is otherwise inadmissible against the defendant in the prosecution's case in chief is not barred for all purposes, provided that "the trustworthiness of the evidence satisfies legal standards." 420 U.S. at 721, 95 S.Ct. at 1221, 43 L.Ed.2d

at 577. *State v. Swinburne, supra,* 116 Ariz. at 412, 569 P.2d at 842.

■ It is clear, therefore, that statements obtained in violation of an accused's fifth amendment right to counsel may be used for impeachment purposes to attack the credibility of the accused. *See State v. Swinburne, supra,* and *Oregon v. Hass, supra.* In the instant case, however, the jury was not instructed as to the restricted and limited purpose for which the statements could be considered, namely, impeaching the appellant's credibility. In both *Harris* and *Hass* the federal supreme court carefully noted that specific instructions were given to the jury concerning the limited purpose for the use of such testimony.

In the event of retrial the statement to Locksa may be used by the state for impeachment, but proper instructions to the jury must be given to limit the use of such testimony to the issue of credibility of appellant and not as evidence of guilt.

## EVIDENTIARY ISSUE

Appellant contends that the trial court erred in admitting into evidence photographs of the victim and a bloody shirt found at the scene. He argues that these items had no probative value, were highly prejudicial, and their admission only served to inflame the jury.

■ Evidence which may tend to incite the jury's emotions is admissible if it is relevant and if its probative value outweighs the danger of unfair prejudice created by its admission. *State v. Chapple,* 135 Ariz. 281, 660 P.2d 1208 (Ariz., 1983); *State v. Gerlaugh,* 134 Ariz. 164, 654 P.2d 800 (1982); Rule 403, Ariz.R. of Evid., 17A A.R.S. In making this determination, the court will look to the purpose of the offer. *State v. Chapple, supra.* Photographs are admissible to identify the victim, to illustrate how the crime was committed, to aid the jury in understanding testimony, and to show the location of the wounds. *State v. Navarre,* 132 Ariz. 480, 647 P.2d 178 (1982); *State v. Vickers,* 129 Ariz. 506, 633 P.2d 315 (1981). The purpose for which the photo-

graphs are admitted must, however, be a contested issue. *State v. Chapple, supra.*

In the instant case, the photographs showed the location and extent of the victim's wounds. Because the appellant asserted self defense at trial, the location of the wounds was evidence to contradict appellant's story and to support the state's theory of how the homicide was committed. *See State v. Gretzler,* 126 Ariz. 60, 612 P.2d 1023 (1980). The wounds found on the victim's hands and in the back of his head are probative evidence that the defendant was not acting in self defense and that the victim may not have been lying down during the attack, as appellant testified. The extent of the wounds also tends to show that the appellant was not acting in self defense. Furthermore, the photographs aided the jury in understanding the pathologist's testimony as to the wounds on the victim. *See State v. Navarre, supra.*

■ Trial courts have great discretion in the admission of photographs. *State v. Schad,* 129 Ariz. 557, 633 P.2d 366 (1981); *State v. Clark,* 126 Ariz. 428, 616 P.2d 888, *cert. denied,* 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980). This discretion will not be disturbed unless it has been clearly abused. *State v. Gerlaugh, supra.* Although the photographs are of the type that may arouse the emotions of some jurors, we cannot conclude that the trial court abused its discretion in finding that the probative value of the photographs outweighed the danger of unfair prejudice attendant to their admission. We find no error.

■ As to the shirt, however, we agree with the appellant that its admission was error. The State argues that the shirt also corroborated its theory of the murder and, therefore, is admissible. The shirt by itself, however, proves nothing. It is only its location and condition after the murder that is relevant to the State's case. The admission of gruesome objects when they add nothing to the evidence to be considered by the jury and serve no other purpose than to inflame the jury is error, *State v. Steele,* 120 Ariz. 462, 586 P.2d 1274 (1978), and we so find in this case.

## ATTEMPTED MURDER CHARGE

The appellant finally contends that the trial court erred in failing to grant his motion for judgment of acquittal on the count of attempted murder.

■ The standard of review to test the sufficiency of evidence on appeal is whether there exists substantial evidence from the entire record from which a rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Tison,* 129 Ariz. 546, 633 P.2d 355 (1981); *State v. Schad,* 129 Ariz. 557, 633 P.2d 366 (1981), *cert. denied,* 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1982). The evidence will be reviewed in the light most favorable to sustaining the verdict and all reasonable inferences will be resolved against a defendant. *State v. Tison, supra; State v. Hall,* 129 Ariz. 588, 589, 633 P.2d 397 (1981).

■ To sustain a conviction for attempted murder, the evidence must show some overt act or steps taken toward the commission of the crime and an intent to commit the crime. *State v. Savchick,* 116 Ariz. 278, 569 P.2d 220 (1977); *State v. Mandel,* 78 Ariz. 226, 278 P.2d 413 (1954); A.R.S. § 13-1001(A)(2). Criminal intent, being a state of mind, is shown by circumstantial evidence. Defendant's conduct and comments are evidence of his state of mind. *State v. Vann,* 11 Ariz.App. 180, 463 P.2d 75 (1970).

■ The record reveals that as Robert Barrick was getting out of the canal, he was hit in the head with a hammer by the defendant. According to Barrick's testimony, he was "knocked out" for a few seconds and floated down the canal, during which time appellant followed alongside the canal. Routhier asked Barrick if he had any money and ordered him out of the canal with the threat that if he did not do so, Routhier would hurt his father. Barrick got out on the opposite side of the canal and climbed up to the freeway to summon help. As he did so, appellant continued to yell at Barrick to "get over there."

There is substantial evidence that appellant performed an overt act toward the commission of the crime. The appellant struck Barrick in the head, a vital area of the body, with a dangerous instrument. There is also evidence from which a rational trier of fact could have found that the appellant had the requisite intent to be guilty of attempted murder. Appellant had just severely beaten Lawrence Barrick. He followed Robert Barrick along the canal and ordered him to get out after once hitting him with the same instrument that killed his father. While the evidence is not overwhelming, it is substantial. *See State v. Tison, supra; State v. Bearden,* 99 Ariz. 1, 405 P.2d 885 (1965). We find no error.

The conviction for first degree murder and for attempted first degree murder are reversed and the case remanded to the superior court for a new trial.

GORDON, V.C.J., and HAYS, CAMERON and FELDMAN, JJ., concur.