NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

JORDAN MICHAEL HANSON, *Appellant*.

No. 1 CA-CR 17-0350
FILED 11-8-2018

Appeal from the Superior Court in Maricopa County
No. CR2015-005451-001
The Honorable Pamela S. Gates, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Alice Jones
*Counsel for Appellee*

Jones Skelton & Hochuli PLC, Phoenix
By Lori L. Voepel
*Counsel for Appellant*

## MEMORANDUM DECISION

Judge Randall M. Howe delivered the decision of the Court, in which Presiding Judge Jennifer B. Campbell and Judge David D. Weinzweig joined.

H O W E, Judge:

¶1        Jordan Michael Hanson appeals his conviction and sentence for second-degree murder. He argues that four reversible errors were committed: (1) the court improperly admitted irrelevant and unduly prejudicial evidence of other firearms; (2) the State failed to preserve potentially exculpatory evidence, thereby violating due process; (3) the jury reached impossible verdicts by finding Hanson guilty based on a gunshot wound to the victim and also deciding that the State did not prove the offense was committed with a firearm; and (4) insufficient evidence supported the conviction. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2        We view the facts in the light most favorable to sustaining the verdict. *State v. Payne*, 233 Ariz. 484, 509 ¶ 93 (2013). In September 2015, Hanson attended a party and consumed alcohol. Afterward, Hanson invited guests to his home, and one of the guests invited C.D. Although he did not want C.D. to be present, Hanson allowed C.D. to enter his home. After a short period of time, Hanson told his guests to leave. Before asking C.D. to leave, Hanson went to his bedroom to retrieve a handgun that was set to double-action mode,[1] which he knew had a bullet in its chamber. When asked to leave, C.D. jokingly refused. Hanson reacted aggressively, repeatedly punching C.D. During the ensuing scuffle, Hanson shot and killed C.D.

¶3        Hanson fled from the scene and drove away in his truck. He later called 9–1–1 and reported that he was at a gas station. He told the police that he had a firearm in his truck, which the officers retrieved. The police arrested him and impounded his truck. An examination of C.D.'s

---

[1]        In single-action mode, the trigger requires 4.5 pounds of force to fire; in double-action mode, the trigger requires 10 pounds of force to fire.

body showed that soot and tearing of his scalp tissue were found in the back of his head, which showed that he suffered a close-contact gunshot wound.

¶4        Law enforcement asked the forensic department to test the gun for both DNA and fingerprints. Swabbing for DNA erases latent fingerprints, so the serologist consulted a latent fingerprint analyst to maximize the evidentiary value of the weapon; they identified which areas of the gun were better suited for obtaining DNA samples and which areas were better for lifting latent fingerprints. Because more DNA collects on the textured areas of a gun, the serologist swabbed some—but not all—of those areas. A forensic examiner tested the DNA samples and determined that the results could not confirm whether C.D. had touched the gun. After the DNA samples were obtained, the gun was processed for latent fingerprints. The latent fingerprints were inconclusive regarding whether Hanson or C.D. had touched the gun.

¶5        Before trial, Hanson learned that the DNA testing might consume all the DNA samples. To prevent this, Hanson moved to stop the DNA testing. Law enforcement promptly stopped the testing process, providing the trial court time to rule on Hanson's motion. The court denied the motion, and the subsequent testing consumed all of the DNA. Hanson was also unable to independently test the gun for latent fingerprints because guns cannot be retested after fingerprint processing. Regarding gunshot residue, the case agent testified that the presence of residue on a body part simply indicates that the person was present when a gun was fired.

¶6        At trial, Hanson testified that he was "not an expert in guns[,]" but could "safely operate a firearm[.]" Based on Hanson's claimed unfamiliarity with firearms, the court allowed a juror to ask Hanson whether the gun used to shoot C.D. was the only firearm that he owned. Hanson answered, "Yes." To contradict this testimony, the State presented photographs of a second handgun found in Hanson's nightstand and a rifle case found in Hanson's closet. After Hanson testified that the case was empty, the State offered another photograph of a rifle inside the case.

¶7        The jury convicted Hanson of second-degree murder based on C.D.'s fatal injury from a gunshot. During the aggravation phase, the jury found that the State had not proved the offense was committed with the use of the gun. The trial court sentenced Hanson to 12 years in prison. He timely appealed.

**DISCUSSION**

**1. Admission of Other Firearm Evidence**

**¶8**        Hanson argues the evidence concerning his possession of other firearms was irrelevant and unfairly prejudicial. We review a trial court's evidentiary rulings for abuse of discretion. *State v. Fish*, 222 Ariz. 109, 114 ¶ 8 (App. 2009).

**¶9**        Hanson's testimony made this evidence relevant and not unfairly prejudicial. He initially placed at issue his general knowledge of firearms. To address this issue, the court permitted a limited "yes or no" question on whether Hanson owned only one firearm. His response to that question opened the door to the State's contradicting evidence, the other handgun and the rifle. *See State v. Martinez*, 127 Ariz. 444, 447 (1980) (permitting the State to present previously inadmissible evidence after the defendant "opened the door" by contradicting the evidence). Thus, the trial court did not abuse its discretion.

**2. Alleged Due Process Violation**

**¶10**       Hanson argues that law enforcement violated his due process rights and prevented him from presenting a complete defense by failing (1) to gather necessary DNA from the gun's textured areas, (2) to obtain adequate fingerprint samples from C.D.'s hands to compare against the fingerprints found on the gun, (3) to preserve the DNA and fingerprints on the gun for independent testing, and (4) to test C.D.'s hands for gunshot residue before he was cremated. He asserts this evidence would have supported his defense that C.D. and Hanson were struggling over the weapon when it fired. Hanson did not object on constitutional grounds at trial, so we review for fundamental error. *State v. Escalante*, 245 Ariz. 135, 140 ¶ 12 (2018).

**¶11**       Police violate due process if they (1) fail to preserve potentially useful evidence for the defendant and (2) act in bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988). The test for bad faith turns on "the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id.* at 56 n*. The innocent destruction of *potentially* exculpatory evidence does not violate due process. *State v. Glissendorf*, 235 Ariz. 147, 150–51 ¶ 11 (2014). Here, due process was not violated.

### a. DNA on the Gun

¶12        Hanson argues that the serologist should have swabbed all of the textured areas of the gun to obtain more DNA to determine whether C.D. had touched the gun. The record shows that law enforcement asked the forensic department to test the gun for both DNA and latent fingerprints. Because swabbing DNA erases fingerprints, the serologist consulted with a fingerprint analyst about which areas of the gun should be used for finding DNA samples and latent fingerprints. As such, any failure to gather DNA from the textured surfaces of the gun was the result of precautions taken to preserve the latent fingerprints—not bad faith.

### b. Fingerprint Comparison

¶13        Hanson argues that law enforcement failed to obtain adequate fingerprint samples from C.D. But this failure was not due to any bad faith. The record shows that the fingerprints on the gun did not have sufficient detail to enable comparison. Even if the officers would have obtained sufficiently detailed fingerprint samples from C.D.'s hands, the fingerprints could not have been matched.

### c. Consumption of Evidence on the Gun

¶14        Hanson argues that law enforcement violated due process by not preserving the DNA when they had the DNA tested. Law enforcement engaged in no bad faith, however, because they obtained court approval for the testing. *See State v. Goudeau*, 239 Ariz. 421, 442 ¶ 47 (2016) (finding no bad faith when the State obtained prior court approval for post-indictment consumption of DNA). Similarly, Hanson argues that the State violated due process by failing to preserve the latent fingerprint evidence on the gun. But the consumption of evidence alone does not establish bad faith. *State v. Bible*, 175 Ariz. 549, 594 (1993). We find no other evidence indicating bad faith.

### d. Gunshot Residue

¶15        Hanson argues that law enforcement should have tested C.D.'s hands for gunshot residue. The case agent's testimony explained, however, that the presence of gunshot residue on a body part simply indicates that a person was present when a gun was fired. Here, C.D. was present when the gun was fired. The presence of gunshot residue on his hands was therefore not potentially exculpatory and would not have supported Hanson's defense that they were struggling over the gun.

Moreover, no evidence was presented to show that law enforcement declined to test C.D.'s hands in bad faith.

### 3. Jury's Legally Inconsistent Verdict

**¶16**　　　　Hanson argues that the jury reached legally inconsistent verdicts by convicting him of second-degree murder, but also finding that the State had not proved the offense involved the use, threatened use, or possession of a deadly weapon during the commission of a crime. As support, he contends that the medical proof was uncontroverted that C.D. suffered no significant injuries other than the gunshot wound. Therefore, he asserts that a new trial is required. Arizona law permits inconsistent verdicts. *Gusler v. Wilkinson ex rel. Cty. of Maricopa*, 199 Ariz. 391, 396 ¶ 25 (2001). Inconsistent verdicts could be based on error, jury nullification, compromise, or lenity. *State v. Hansen,* 237 Ariz. 61, 68 ¶ 20 (App. 2015). Regardless of the reason, we will not pry into the jury's deliberative process. *Id.* We find no error. *See State v. Parsons*, 171 Ariz. 15, 15–16 (App. 1991) (finding no error when the jury found defendant guilty of aggravated assault based on use of a deadly weapon or dangerous instrument but found the offense was not dangerous because the State had not proven the offense involved the use of a deadly weapon or dangerous instrument).

### 4. Sufficient Evidence for the Verdict

**¶17**　　　　Hanson contends that his conviction was not supported by sufficient evidence. A person commits second-degree murder by— among other ways—intentionally causing another person's death. A.R.S. § 13–1104(A)(1). In reviewing the sufficiency of the evidence, we determine whether the State presented substantial evidence from which a reasonable trier of fact could have found guilt beyond a reasonable doubt. *State v. Routhier*, 137 Ariz. 90, 99 (1983).

**¶18**　　　　Viewing the facts in the light most favorable to sustaining the conviction, we find substantial evidence from which a reasonable jury could have decided Hanson intentionally caused C.D.'s death. Before telling C.D. to leave his home, Hanson armed himself with his handgun, which had a bullet in its chamber. He then initiated the physical confrontation with C.D., and he was holding the gun when it fired. While he testified that the gun's safety was on, a reasonable jury could have believed that he switched the safety off because, barring the introduction of some defect in the gun's safety mechanism, the gun could not be fired with the safety still engaged. Furthermore, Hanson had the gun set to double-action mode, which required greater force to pull the trigger. The

added force required to fire the gun in double-action mode reduced the likelihood that the gun fired unintentionally. Moreover, the evidence demonstrated that C.D. was shot in the back of the head at close range. Thus, a rational jury could have found that Hanson pulled the trigger when the gun was pressed against the back of C.D.'s head.

¶19      Hanson counters that he was justified in using deadly physical force because he was in imminent peril of death or serious physical injury and C.D. was trespassing after he refused to leave. Under A.R.S. § 13–418, deadly force in defense of a residential structure is justified only against a person who "was in the process of unlawfully or forcefully entering, or had unlawfully or forcefully entered" the residential structure. This justification does not apply to using force against invited guests. Here, Hanson admitted that he allowed C.D. into his home. Thus, this argument fails.

**CONCLUSION**

¶20      For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:  AA

7