IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

**STATE OF ARIZONA,**
*Appellee,*

*v.*

**GIOVANI FUSTER MELENDEZ,**
*Appellant.*

No. CR-23-0215-PR
Filed March 28, 2025

Appeal from the Superior Court in Maricopa County
The Honorable Stephen M. Hopkins, Judge (Retired)
No. CR2019-104831-001
**AFFIRMED**

Opinion of the Court of Appeals, Division One
256 Ariz. 14 (App. 2023)
**VACATED**

COUNSEL:

Kristin K. Mayes, Arizona Attorney General, Joshua D. Bendor (argued), Solicitor General, Alice M. Jones, Deputy Solicitor General, Eric K. Knobloch, Assistant Attorney General, Phoenix, Attorneys for State of Arizona

Gary Kula, Maricopa County Public Defender, Dawnese C. Hustad (argued), Deputy Public Defender, Phoenix, Attorneys for Giovani Fuster Melendez

Molly Brizgys (argued), Mitchell Stein Carey Chapman PC, Phoenix, Attorneys for Amicus Curiae Arizona Attorneys for Criminal Justice

VICE CHIEF JUSTICE LOPEZ authored the Opinion of the Court, in which JUSTICES BEENE, KING, BRUTINEL (RETIRED)[1] and BERCH (RETIRED) [2] joined. JUSTICE BOLICK concurred. CHIEF JUSTICE TIMMER concurred.

_____

VICE CHIEF JUSTICE LOPEZ, Opinion of the Court:

¶1        We consider whether the State violates a defendant's due process rights under the Fourteenth Amendment to the United States Constitution when it comments at trial, for impeachment purposes, on a defendant's post-*Miranda* statements and temporary deferrals to answering some questions during an in-custody interview.  We hold that the State may use a defendant's post-*Miranda* statements and his temporary deferrals to responding to some questions for impeachment purposes if the defendant, during the in-custody interview, fails to unambiguously invoke his *Miranda* rights and ultimately speaks on the substantive matters raised by the questions.  We conclude that the State did not violate the defendant's due process rights and affirm his convictions and sentences.

## BACKGROUND

¶2        In 2017, Giovani Fuster Melendez moved from Puerto Rico to Arizona and rented an apartment in Phoenix with his mother.  Melendez's mother attended church services held at the apartment complex, pastored by the parents of the victim ("A.G.").  Melendez became acquainted with A.G. through the family church connection.  Melendez and his mother moved out of the apartment complex in late 2018.

¶3        One year later, Melendez returned to the apartment complex and saw A.G. standing in the parking lot.  Melendez parked his car, walked toward A.G., and asked, "are you the pastor's son?"  When A.G. responded

_____

[1] Although Justice Brutinel retired prior to the issuance of this Opinion, he participated in the decision of the Court.
[2] Justice Montgomery is recused from this matter.  Pursuant to article 6, section 3 of the Arizona Constitution, Justice Rebecca White Berch (Ret.) of the Arizona Supreme Court was designated to sit in this matter.

and started walking toward him, Melendez pulled a gun and fired multiple shots at A.G. Each shot missed A.G., hitting the surrounding apartment complex walls. Melendez then ran to his car and drove back to his apartment.

¶4        Shortly after the shooting, officers took Melendez into custody and interviewed him at a nearby precinct. The officer read Melendez his *Miranda* rights and Melendez confirmed that he understood them. The interview began with a question about Melendez's car, but immediately after, Melendez asked what would happen if he chose to not speak. The officer said that Melendez had the right to remain silent, and if he did not feel comfortable talking, he could say "I don't want to talk anymore." Melendez immediately replied, "yeah I don't want to talk anymore." The interview ended.

¶5        Five hours later, a detective interviewed Melendez at the Phoenix police station. Before asking any questions, the detective re-read Melendez his *Miranda* rights and he again confirmed he understood them. The detective asked Melendez about his background, then inquired why he was upset with the pastor's son. Melendez explained that he "never had a personal problem with them," and even had dinner with the pastor's family a week before the shooting. But Melendez reserved his answer when asked why he shot at the pastor's son:

> Detective:    So what made you go over there today and shoot the pastor's son?
>
> Melendez:    I want to hold uh . . . I want to hold um some stuff I want to say.
>
> Detective:    Ok.
>
> Melendez:    Just because I . . . I feel a little blindsided.
>
> Detective:    And that's fine however you feel I'm not gonna you know force you to say anything you don't want to. Like I said I just want to get your side of the story.

3

¶6 The detective then asked about the gun used in the crime. Melendez explained that he owned and always carried the gun for protection, that it was a .45 caliber Glock registered to him, and the police could find it in his apartment. But when asked if he felt he needed to protect himself from the pastor's son, he again deferred and said, "I still want to hold up on some information." The detective followed up by asking if there was anything Melendez wanted to tell her, but he did not reply. The detective then squarely addressed Melendez's actions:

Detective: Do you understand that it's a crime to shoot somebody or shoot your gun at somebody?

Melendez: Yeah I know what is a crime and what is not.

Detective: Do you believe you committed a crime today?

Melendez: I still want to hold myself on some things.

Detective: Did you shoot at somebody today?

Melendez: I . . . I would um . . . I would hold uh information.

Detective: Ok, so we will set that aside.

¶7 At this point, halfway through the thirty-minute interview, Melendez confirmed his willingness to continue. The detective told Melendez, "if you don't feel comfortable talking to me about it, that's fine, it's your decision." Melendez replied, "I don't mind talking to you. Thank you for being nice. Nothing like the [TV] shows."

¶8 Although the conversation up to this point remained congenial, the detective abruptly told Melendez he would be going to jail. Melendez explained he felt "blindsided," and the detective asked if she could explain anything he was not sure about. To this, Melendez asked what the pastor was saying. The detective clarified that the pastor was not saying anything, but other witnesses reported Melendez asking A.G. if he was the pastor's son. When asked why he was interested in what the pastor was saying, Melendez responded, "I'm going to pass this question." Melendez continued to defer his answers:

4

Detective:     So I am just so confused then, why would you go over there with a gun?

Melendez:     That's what I want to say about my relationship with the pastor and the pastor's sons.

Detective:     Okay. Is there somebody else that you were after and not them?

Melendez:     Sorry I apologize, I don't mean to you know ignore you. So I want to pass again.

Detective:     Okay. I'll make sure I make that clear you have no problem with the pastor or his family.

Melendez:     Yeah, I have never had any trouble with them.

Detective:     I guess I'll just wonder why you went over there with a gun. You were upset today?

Melendez:     Um . . . I'll pass again.

Detective:     Okay. Alright is there anything else that you want to tell me or you feel like I forgot to ask you about today? . . . Did you work today?

Melendez:     Yes, I went to work.

Detective:     Did anything happen before you went to the pastor's house or apartment? Did anything happen today to make you mad?

Melendez:     I'll pass this question. Sorry.

¶9          When asked if he remembered any of the day's events, he said, "I'll pass that question . . . I just want to hold what I did today, and any information that you are trying to figure out. I just want to hold everything for now." The detective responded, "that's fine. That's your

right," and said, "I'll give you one more chance to let it off your chest." Melendez affirmed he was fine, and the detective left the room to get water.

¶10        When the detective returned, Melendez volunteered his version of the events.  He said he wanted to tell her something and explained, "I wanted to wait because . . . I don't know what people on the other side are trying to do, what they are trying to say."  He told her it was his habit to drive around when bored, and that day he drove to his old apartment complex.  There, Melendez explained, he saw A.G. in the parking lot, asked if he was the pastor's son, and A.G. responded, "Oh, qué pasa cabrón?"  Melendez later testified at trial that the word "cabrón," in Puerto Rico, is offensive depending on the context.  A.G. then appeared hostile because, while making this greeting, he walked towards Melendez and moved his hand "looking for something."  Melendez shot at A.G. in response to this perceived aggression.  The detective thanked Melendez for his honesty and concluded the interview.

¶11        The State charged Melendez with aggravated assault and five counts of endangerment.  At trial, Melendez testified that he fired at A.G. in self-defense because he believed A.G. was about to retrieve a gun from his pocket and shoot him.

¶12        On cross-examination, the prosecutor attempted to impeach Melendez's trial testimony that he acted in self-defense by noting that, prior to claiming self-defense in the interview, Melendez decided to "pass" and "hold" on many of his answers.  The prosecutor also confirmed that Melendez asserted self-defense only after the detective informed him that he was going to jail for the shooting:

> Prosecutor:  Isn't it true that while you were talking to [the detective] you never claimed self-defense until after she told you [that] you were going to jail for shooting at the pastor's son?
>
> Melendez:  She just happened to bring me that information as I was already decided to come in that it was self-defense.
>
> Prosecutor:  Okay. But, again, after she told you you're going to jail for shooting at the pastor's son,

6

that's when you're claiming that it was self-defense?

Melendez:     'Cause she told me: I will be right back, you know, and—and she told me that it was like my last chance to say something, and she went outside. And then when she came, I had decided to—to tell her that it was self-defense.

Prosecutor:   Okay. I'm glad you brought that up. So isn't it true that you were asked probably ten times direct questions such as: What made you go over there and shoot today? Do you remember her asking you that?

Melendez:     Yes.

¶13         During closing arguments, the prosecutor urged the jury to question the credibility of Melendez's self-defense claim because a "reasonable person" would have answered the detective's questions about the motive for the shooting if he "really just shot in self-defense." The prosecutor also emphasized Melendez's reticence to assert his self-defense claim during his interview until the detective informed him that he was going to jail:

I counted ten or 11 times that he is asked a direct question about: Why did you go over there and shoot? Why did you have a gun? Why did you ask that question?

And his answer was something along the lines of: I want to hold that information. I'm going to pass on that question. I mean, if you were shot at or if you believe that you were going to be shot at, and that's why you discharge your own gun at somebody four times, once the police do get there, don't you want to tell them that? Wouldn't you want to say: Hang on one second, you have me in handcuffs, you put me in here, but here's what happened.

¶14         The jury convicted Melendez on all charges and the superior court sentenced him to presumptive, concurrent terms of 7.5 years'

imprisonment for aggravated assault and 2.25 years' imprisonment for each count of endangerment.

¶15　　　　On appeal, Melendez's counsel filed a brief pursuant to *Anders v. California*, 386 U.S. 738 (1967), and *State v. Leon*, 104 Ariz. 297 (1969), advising the court of appeals that there were no meritorious grounds for reversal. After review of the record, the court ordered the parties to brief whether the State's references to Melendez's refusal to answer certain questions during custodial interrogation violated his constitutional rights and whether fundamental prejudicial error occurred. After briefing, the court held that "such error occurred when the State cross-examined Melendez about his selective silence and then asked the jury to hold that silence against him during closing argument." *State v. Melendez*, 256 Ariz. 14, 17 ¶ 2 (App. 2023). The State sought review in this Court. We granted review because this case presents a recurring issue of statewide importance. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. §§ 13-4031, -4033(A)(1).

## DISCUSSION

¶16　　　　Melendez argues that the trial court erred by allowing the State to comment at trial on what he and the court of appeals describe as his post-*Miranda* "selective silence"—or his decision to temporarily defer answering questions during his police interview—in violation of the Fourteenth Amendment's Due Process Clause. Melendez did not object to this alleged error at trial, so we review for fundamental error. *State v. Escalante*, 245 Ariz. 135, 140 ¶ 12 (2018). In fundamental error review, we first determine whether a trial court erred. *Id.* at 142 ¶ 21. If so, we evaluate whether the error was fundamental and prejudicial. *Id.* "A defendant establishes fundamental error by showing that (1) the error went to the foundation of the case, (2) the error took from the defendant a right essential to his defense, *or* (3) the error was so egregious that he could not possibly have received a fair trial." *Id.* (emphasis in original). If the defendant proves both fundamental error and prejudice, we must grant a new trial. *Id.*

### I.

¶17　　　　Melendez's challenge rests on the Fourteenth Amendment, but his substantive claim arises from his right against self-incrimination

8

under the Fifth Amendment. For this reason, we begin our analysis with that constitutional provision.

**A.**

**¶18** The Fifth Amendment, incorporated against the states through the Fourteenth Amendment, provides that: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The privilege against self-incrimination is viable "only when the person is guaranteed the right to remain silent." *Miranda v. Arizona*, 384 U.S. 436, 460 (1966) (internal quotation marks omitted) (quoting *Malloy v. Hogan*, 378 U.S. 1, 8 (1964)). To safeguard this right, the Supreme Court mandated that police apprise an individual in custody, prior to questioning, of the following: his right to remain silent, that anything he says can be used against him in court, and that he has a right to an attorney or to have one appointed if he cannot afford one. *Id.* at 479. This advisement is, of course, the *Miranda* warning.

**¶19** These Fifth Amendment protections, however, are not self-executing. A suspect must assert them. *Salinas v. Texas*, 570 U.S. 178, 181 (2013) ("It has long been settled that the privilege 'generally is not self-executing' and that a witness who desires its protection 'must claim it.'" (quoting *Minnesota v. Murphy*, 465 U.S. 420, 425, 427 (1984))). To claim the right to remain silent, an individual must unequivocally and "unambiguously" invoke it. *Berghuis v. Thompkins*, 560 U.S. 370, 379, 381–82 (2010) (holding that a suspect did not unambiguously invoke his right to remain silent by merely remaining silent for two hours and forty-five minutes); *State v. Payne*, 233 Ariz. 484, 501 ¶ 40 (2013) ("An invocation of the right to silence must be unequivocal and unambiguous . . . ."). Thus, a suspect who simply remains quiet "has not done enough to put police on notice that he is relying on his Fifth Amendment privilege." *Salinas*, 570 U.S. at 188.

**¶20** Once an individual invokes his right to remain silent, police must cease questioning. *Michigan v. Mosley*, 423 U.S. 96, 103–04 (1975). Prosecutors may not comment at trial on a defendant's post-invocation silence. *Jenkins v. Anderson*, 447 U.S. 231, 235 (1980). However, "[a]nswering questions after police properly give the *Miranda* warnings constitutes a waiver [of these rights] by conduct." *State v. Trostle*, 191 Ariz. 4, 14 (1997) (quoting *State v. Tapia*, 159 Ariz. 284, 287 (1988)); *see also Berghuis*,

560 U.S. at 385 ("As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford.").

**B.**

¶21 The record belies any claim that Melendez unequivocally or unambiguously invoked his right to remain silent during his second interview. The State twice issued *Miranda* warnings to Melendez. During the first interview, the officer ceased post-*Miranda* questioning immediately after Melendez said, "I don't want to talk anymore." Thus, Melendez knew how to unequivocally invoke his right to remain silent and that such an invocation would be honored. During his second interview, however, after his second *Miranda* warning, Melendez elected to proceed with questioning. In light of Melendez's earlier invocation, we cannot conclude he unequivocally or unambiguously invoked his right to remain silent in his second interview when he stated that he would "hold" and "pass" on answering certain questions "for now." Indeed, Melendez's mid-interview statement that he was willing to continue the interview buttresses this conclusion.

¶22 Melendez's statements are more aptly characterized as tactical deferrals to responding to specific questions than unequivocal refusals to answer. Melendez repeatedly confirmed during his interview and at trial that he merely intended to delay his answers. For example, in response to one of the detective's questions about the day's events, Melendez clarified that he did not wish to discuss the shooting because he "just want[ed] to hold everything for now." Following that and similar deferrals, and immediately prior to asserting his self-defense claim, Melendez explained that he "wanted to wait" to explain his conduct until he knew what "people on the other side" were saying about the shooting. Critically, Melendez actually confessed to the shooting and asserted self-defense during the interview. These statements effectively answered the questions to which he had intentionally demurred. At trial, Melendez confirmed that he had "already decided to come in that it was self-defense" during the interview even before the detective told him he would be going to jail.

¶23 On this record, Melendez's initial expressed reticence to answer certain questions about the crime until he knew the information police had gathered about the shooting, and his subsequent answers, constitute neither unequivocal nor unambiguous invocations of his right to remain silent. Moreover, because Melendez never invoked his right to remain silent, tactically delayed his responses, and ultimately answered the substance of the questions during the interview, there was no "selective silence." We therefore need not decide here whether silence in response to only some questions during police questioning constitutes an invocation of the Fifth Amendment right against self-incrimination.

## II.

¶24 We now turn to Melendez's claim that the State violated his Fourteenth Amendment due process rights.

## A.

¶25 The Fourteenth Amendment provides that states may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1; *see also* Ariz. Const. art. 2, § 4. Melendez argues that the State violated his due process rights by promising him, in the *Miranda* warning, his right to remain silent, but then vitiated his right by impeaching him at trial with his refusal to answer certain questions during his custodial interview and commenting on his deferred answers during closing argument.

¶26 "The touchstone of due process under both the Arizona and federal constitutions is fundamental fairness." *State v. Melendez*, 172 Ariz. 68, 71 (1992) (holding it constitutionally unfair for the State to provide a prisoner the right to legal representation and then call that counsel to testify against the prisoner regarding said legal representation). Impeachment of a defendant's trial testimony with his post-*Miranda* silence implicates this notion of constitutional, fundamental fairness. *Doyle v. Ohio*, 426 U.S. 610, 618–19 (1976).

¶27 In *Doyle*, the Supreme Court consolidated two cases where prosecutors sought to impeach a defendant's trial testimony with his post-*Miranda* silence. *Id.* at 611. Notably, during the interrogations, the defendants did not invoke their right to remain silent, but effectively

remained entirely silent after receiving *Miranda* warnings. *Id.* at 611, 614 n.5. At trial, the state impeached the defendants' exculpatory testimony with their failure to explain their innocence to officers during their post-*Miranda* interviews. *Id.* at 616–17. The Court held that it would be "fundamentally unfair," and thus a violation of the Fourteenth Amendment's Due Process Clause, for the state to use this silence for impeachment purposes because the *Miranda* warning impliedly promises "that silence will carry no penalty." *Id.* at 618–19.

**B.**

**¶28** We now consider whether *Doyle* applies to this case. Melendez argues that the prosecutor violated *Doyle* by referencing his alleged "selective silence" during the State's cross-examination and closing argument. We do not need to reach this argument because Melendez was not selectively silent.

**¶29** Rather than remaining absolutely or selectively silent, Melendez continued to speak throughout the interrogation. As noted above, Melendez's deferral statements did not invoke his right to remain silent but were intended to delay giving his version of events until he knew what others would say. Accordingly, because Melendez responded to each question, he "[did] not remain[] silent at all." *Anderson v. Charles*, 447 U.S. 404, 408 (1980).

**¶30** Moreover, *Doyle* is readily distinguishable from this case. In *Anderson v. Charles*, the Supreme Court held that *Doyle*'s unfairness concerns about penalizing post-*Miranda* silence are absent when a defendant is impeached with his prior inconsistent statements. *Id.* at 407–08. In *Anderson*, the defendant was tried for killing a man and stealing his car. *Id.* at 404–05. The defendant testified he retrieved the car in a different location than he had identified in a post-*Miranda* interrogation. *Id.* at 405. The prosecution impeached the defendant's testimony with this prior inconsistent statement, but in doing so, also commented on the defendant's initial failure during the interrogation to describe the location where he had stolen the car. *Id.* at 405–06. The Sixth Circuit held that this reference to the defendant's silence violated *Doyle*. *Id.* at 407.

¶31    The Supreme Court reversed, holding that *Doyle*'s prohibition on the use of post-*Miranda* silence to impeach a defendant's trial testimony did not apply where the prosecutor's impeachment involved a defendant's prior inconsistent statements. *Id.* at 408–09. The Court explained that "a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent," and, "[a]s to the subject matter of his statements, the defendant has not remained silent at all." *Id.* at 408. In that circumstance, there is "no unfair use of silence." *Id.* The Court reasoned that the reference to the defendant's silence was part of an impeachment which, "taken as a whole," was "not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement." *Id.* at 408–09. Therefore, the impeachment was proper. *See id.* at 409.

¶32    Here, the prosecutor's cross-examination of Melendez is more akin to the permissible impeachment by prior inconsistent statement in *Anderson* than the prohibited impeachment by true silence in *Doyle*. *Cf. Jenkins*, 447 U.S. at 239 ("Common law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted."). Taken as a whole, the prosecutor contrasted Melendez's self-defense testimony with the self-defense claim he made during his interview. The prosecutor contextualized the latter primarily with references to Melendez's words—not his silence. To do this, the prosecutor walked through each of Melendez's deferrals prefacing his self-defense claim and occasionally referenced Melendez's failure to answer questions during his interrogation. Melendez contends that these references, and the comments on his deferrals, were intended to draw meaning from silence. Not so.

¶33    Like the Court in *Anderson*, we conclude that the prosecutor's trial references to Melendez's deferrals to answering interview questions do not implicate *Doyle*. As a whole, the impeachment was intended to question the legitimacy of Melendez's self-defense claim—unequivocal during trial but preceded by wavering tactical deferrals during his interview—which Melendez used as a ploy to stall his answers until he knew what witnesses had told police about the shooting. The prosecutor, during cross-examination and closing argument, exploited Melendez's stalling primarily by invoking Melendez's words, not his silence, to describe Melendez's attempt to craft a narrative consistent with other investigative information. Although the prosecutor referenced Melendez's silence, as in *Anderson*, it was part of the prosecution's overall attempt to

impeach Melendez's testimony with his prior statements. *See State v. Tuzon*, 118 Ariz. 205, 207 (1978) (holding that prosecutors do not violate *Doyle* when impeaching a defendant with his post-*Miranda* interrogation statements that omitted facts later testified to at trial).

¶**34** Unlike in *Doyle*, Melendez's deferrals to answering some questions never resulted in post-*Miranda* silence because he ultimately and voluntarily answered the substance of the questions when he asserted his defense in the same interview—almost every question Melendez initially "passed" on went to his involvement in the shooting and his motive. Having voluntarily spoken about his role and motive in the crime, after receiving *Miranda* warnings, Melendez did not remain silent at all "as to the subject matter of his statements." *Anderson*, 447 U.S. at 408. Taken as a whole, the prosecutor's cross-examination and closing arguments did not violate Melendez's due process rights. Although we hold that Melendez did not invoke his right to silence in these circumstances, we leave for another day whether similar deferrals, absent a suspect claiming a defense in the same interview, constitute an invocation of the right against self-incrimination.

## C.

¶**35** This case is not a perfect fit under the *Anderson* rubric, but *Anderson* is more apt than *Doyle*. But even if we declined to apply *Anderson* on the ground that it involved impeachment by inconsistent statements rather than by statements implying Melendez tailored his defense to meet witness accounts, we still would conclude that the prosecutor's use of Melendez's post-*Miranda* statements and deferred answers did not violate his due process rights because Melendez was not selectively silent.

¶**36** Melendez and the court of appeals rely, in part, on *State v. Sorrell*, 132 Ariz. 328 (1982), and *State v. Routhier*, 137 Ariz. 90 (1983), to conclude that the State's impeachment violated Melendez's due process rights. *Melendez*, 256 Ariz. at 26 ¶¶ 26–29. We are unpersuaded. In *Sorrell*, the defendant unambiguously invoked his right to silence immediately after being informed of his *Miranda* rights, waited ninety minutes after being placed in a holding cell, and then gave a statement pronouncing his innocence following a second *Miranda* warning. 132 Ariz. at 329. At trial, the prosecutor emphasized the defendant's delay in explaining his conduct by referencing his silence via invocation in his first interview. *Id.* We held

that the state may not comment on the defendant's silence after invocation, even if he later decides to waive his rights. *Id.* at 330. *Sorrell* is inapposite because Melendez neither unequivocally nor unambiguously invoked his right to silence during the second interrogation.

**¶37** *Routhier* also fails to advance Melendez's position. There, the defendant initially spoke with a detective after signing a waiver of his *Miranda* rights, but later invoked his right to counsel, thereby terminating questioning. *Routhier*, 137 Ariz. at 93–94. Three days later, another detective interviewed the defendant before counsel had been provided. *Id.* at 94. While cross-examining the defendant at trial, the prosecution confirmed he "at no point mentioned any kind of self-defense" when initially speaking with the detective. *Id.* at 95. We held that it was permissible for the prosecution to comment on what the defendant volunteered to say prior to reinvoking his rights, but the prosecutor "violated [the] appellant's fifth amendment right to silence" when commenting on what the defendant failed to say during that time. *Id.* at 96. Critically, we emphasized that the prosecutor violated the defendant's rights by commenting on his "failure to make a complete statement or to answer particular questions," in light of the defendant's "express invocation of his rights." *Id.* (holding that "it was impermissible to ask questions on matters about which the appellant had not made any comment or given any information").

**¶38** The court of appeals also relied on three pre-*Doyle* and pre-*Anderson* cases — *State v. Shing*, 109 Ariz. 361 (1973), *State v. Anderson*, 110 Ariz. 238 (1973), and *State v. Ward*, 112 Ariz. 391 (1975). *Melendez*, 256 Ariz. at 24–25 ¶¶ 17–21, 26 ¶ 34, 29 ¶ 49. These cases, too, are distinguishable because they involve the classic *Doyle* scenario — impeachment based on defendants' true silence rather than deferrals, which did not constitute silence. Unlike Melendez, the defendants in those cases refused to answer *any* police questions and told their stories for the first time at trial. *See Shing*, 109 Ariz. at 362; *Anderson*, 110 Ariz. at 239; *Ward*, 112 Ariz. at 392.

**¶39** Here, the prosecutor did not violate Melendez's rights by commenting on Melendez's post-*Miranda* deferrals to some questions prior to admitting the actus reus by asserting his self-defense claim. Unlike *Doyle*, *Sorrell*, or *Routhier*, where the defendants declined to answer questions and never asserted a defense during their custodial interviews before invoking

their rights or otherwise ending the interviews, Melendez failed to invoke his right to remain silent *and*, by asserting his defense, ultimately answered the questions he had "passed" on in the same interview. In other words, the prosecutor did not impermissibly ask questions at trial "on matters about which [Melendez] had not made any comment or given any information." *Routhier*, 137 Ariz. at 96. Melendez's statements about his role in the shooting, his defense, his attempt to discern what other witnesses had told the detective, and his reason for deferring answers to several questions were all matters he eventually discussed with police. In context of the unique facts of this case, the prosecutor did not impeach Melendez for his silence, but rather for his admitted attempt to elicit information from the interviewing officer before telling his version of the story.

### III.

**¶40**        Courts diverge on whether *Doyle* precludes use of post-*Miranda* selective silence to impeach a testifying defendant. Some courts have concluded that *Doyle* prohibits prosecutors from this use of a defendant's selective silence. *See, e.g.*, *United States v. Williams*, 665 F.2d 107, 109–10 (6th Cir. 1981) (holding that the defendant's due process rights, as recognized by *Doyle*, were violated when the prosecution cross-examined him about his failure to answer some questions during a post-*Miranda* interrogation); *see also Bartley v. Commonwealth*, 445 S.W.3d 1, 12 (Ky. 2014) (recognizing that due process "ordinarily bars the use of an accused's post-*Miranda*-warning selective silence"). Other courts have declined to extend *Doyle* to prohibit impeachment using a defendant's selective silence. *See, e.g.*, *United States v. Burns*, 276 F.3d 439, 441–42 (8th Cir. 2002) (holding that the admission of a defendant's silence in response to one question did not violate *Doyle* because the defendant waived his *Miranda* rights and did not unequivocally invoke his constitutional right to silence); *see also People v. Bowman*, 136 Cal. Rptr. 3d 119, 127 (Ct. App. 2011) (holding that "the *Doyle* rule did not prohibit the prosecution's use of [defendant's] selective silence" because the defendant did not state that he wanted to cease all further questioning or invoke his right of silence).

**¶41**        We note, without comment, that our jurisprudence has touched upon this issue. *See, e.g.*, *State v. Maturana*, 180 Ariz. 126, 130 (1994) (reasoning that, by choosing to answer "some questions and remain silent as to others," the state was permitted to comment on the defendant's silence because he "never invoked his right to remain silent"; "[b]ecause defendant

did not invoke his right to remain silent, there is no *Doyle* violation"); *State v. Reinhold*, 123 Ariz. 50, 53 (1979) (explaining that reference to the defendant's selective silence did not violate *Doyle* because the defendant "did not invoke his right to remain silent").

¶42 Our holding that Melendez's deferred answers do not constitute selective silence obviates the need to decide whether a prosecutor's use of selective silence for impeachment implicates *Doyle*. Accordingly, we decline to address our jurisprudence beyond the facts of this case and we leave for another day the question of *Doyle*'s applicability to selective silence.

**IV.**

¶43 With no *Doyle* due process violation in this case, "this issue becomes one of state evidentiary law." *State v. Henry*, 176 Ariz. 569, 580 (1993). Melendez argued in the court of appeals that the trial court erred in not precluding, pursuant to Arizona Rule of Evidence 403, the prosecution from referencing his "passing" and "holding" on certain questions during his in-custody interview. Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." The court of appeals did not address this argument, finding it moot, because it reversed Melendez's convictions and sentences on other grounds. *Melendez*, 256 Ariz. at 32 ¶ 64. We decide this issue in the interest of judicial economy. *Lewis v. N.J. Riebe Enters., Inc.*, 170 Ariz. 384, 394 (1992) ("Under Rule 23[(m)(2)], Arizona Rules of Civil Appellate Procedure, this court has the authority either to decide these issues [raised in but not addressed by the court of appeals] or to remand to the court of appeals for decision.").

¶44 Melendez relies on *United States v. Hale*, 422 U.S. 171, 180 (1975), for the proposition that silence at the time of arrest is generally not very probative, but carries a significant potential for unfair prejudice. *Hale* is distinguishable, however, because it was predicated on the defendant's absolute silence, which is markedly absent here. 422 U.S. at 181 ("[W]e hold that under the circumstances of this case it was prejudicial error for the trial court to permit cross-examination of respondent concerning his silence during police interrogation."). Here, there was no Rule 403 error because the prosecution had the right to impeach Melendez with his own

post-*Miranda* statements that did not invoke his right to remain silent. *Cf. Salinas*, 570 U.S. at 183 (recognizing "the general principle that the Government has the right to everyone's testimony" (quoting *Garner v. United States*, 424 U.S. 648, 658 n.11 (1976))). The probative value of Melendez's post-*Miranda* statements was not substantially outweighed by a danger of unfair prejudice.

**CONCLUSION**

**¶45**　　　The court of appeals posits that a bright line rule vitiating *Doyle*'s due process protections if a defendant merely utters a single word post-*Miranda* would be "unreasonable." *Melendez*, 256 Ariz. at 27 ¶ 41. But that circumstance is not before us. Melendez answered substantive questions in his post-*Miranda* interview and spoke about his presence at the crime scene, his relationship with the victim, his role in the shooting, his self-defense claim, his possession of the gun used in the offense and where the detective could retrieve it, and his decision to temporarily defer answering certain questions—which he ultimately answered in his interview—until he knew what witnesses said to the police about the shooting. Melendez waived his right to silence when he commented and provided information on all of these topics. *See Anderson*, 447 U.S. at 408; *Routhier*, 137 Ariz. at 96. The prosecutor was entitled to use these statements for impeachment purposes at trial. It would be unreasonable to extend *Doyle*'s due process protections to this circumstance.

**¶46**　　　The trial court did not err by permitting the State to comment on Melendez's post-*Miranda* statements and temporary deferrals to answering some questions. Accordingly, we affirm Melendez's convictions and sentences and vacate the court of appeals' opinion.

BOLICK, J., concurring.

¶47        I join the Court's opinion in full.  In light of U.S. Supreme Court precedents and our opinions applying them, I find this a very close case, though I conclude that the Court has reached the correct outcome.  But I believe that trying to make sense of the Supreme Court's hopelessly muddled cases applying *Miranda*'s "prophylactic" rules is unnecessary because those rules exceed the U.S. Supreme Court's authority with regard to state criminal proceedings and procedures.  Instead, I would focus exclusively on whether a defendant's Fifth Amendment right against self-incrimination was violated through a coerced confession or otherwise.  Here, it clearly was not.

**A.**

¶48        This case requires us to determine whether the prosecution could properly use Melendez's alleged selective silence to discredit his argument of self-defense.  Precedents from the Supreme Court and this Court are unclear and inconsistent.  In *Doyle v. Ohio*, 426 U.S. 610, 618 (1976), for instance, the Supreme Court noted that although "the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit," and, therefore, "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial."  Thereafter, in *Anderson v. Charles*, 447 U.S. 404, 408 (1980), the Court clarified that "*Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements."  Thus, we are left to determine whether a partly silent, partly loquacious suspect falls into the first category or the second.

¶49        This Court's cases are somewhat in tension as well.  In *State v. Routhier*, 137 Ariz. 90, 96 (1983), for instance, this Court held, rather categorically, that while it was permissible for the prosecutor to ask questions at trial "on matters which the [defendant] had volunteered prior to reinvoking his rights, it was impermissible to ask questions on matters about which the [defendant] had not made any comment or given any information."  But in *State v. Maturana*, 180 Ariz. 126, 130 (1994), this Court held that trial testimony regarding a defendant's silence in response to certain questions was not improper because the defendant "never invoked his right to remain silent—he merely chose to answer some questions and

remain silent as to others.  Indeed, he chose to do so after being read his rights and stating that he understood them."

**¶50**　　　The Court's opinion here meticulously analyzes applicable federal and state jurisprudence and, in my view, correctly determines that Melendez's selective silence was not shielded from the prosecutor's commentary.  This laborious inquiry is necessitated, as the Supreme Court observed in *Doyle*, by the fact that "every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested."  426 U.S. at 617.  That language is important and revealing: this Court is required to resolve insolubly ambiguous issues regarding a suspect's silence not because of the Fifth Amendment right against self-incrimination, but because of due process implications flowing from "what the State is required to advise the person arrested."  *See id.*

**¶51**　　　Our Court and others have reflexively concluded that a police officer's, or a prosecutor's, or a trial court's wrong guess as to which side of this ambiguity a particular comment or inquiry falls means that the state has "violated [the defendant's] [F]ifth [A]mendment right to silence." *Routhier*, 137 Ariz. at 96.  That is so despite the fact that the Supreme Court has stated repeatedly that the failure to follow *Miranda*'s prophylactic rules is *not* tantamount to a Fifth Amendment violation.  *See, e.g., Vega v. Tekoh*, 597 U.S. 134, 149 (2022) (noting that it is an "insupportable position" to suggest that a "*Miranda* violation is tantamount to a violation of the Fifth Amendment").  If there is an ambiguity that we need to clear up in this area of law, it is not the dividing line between protected and unprotected silence, which today's opinion attempts to fathom, but between the Constitution's guarantees and the prophylactic rules the Supreme Court has articulated to direct their enforcement.  I believe the states are bound only by the former, not the latter; and that is where this Court's focus should be directed in cases like this one.

### B.

**¶52**　　　In relevant part, the Fifth Amendment provides: "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."  U.S. Const. amend. V.  That protection was extended to the states through the due process guarantee of the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6 (1964).

¶53         *Miranda v. Arizona*, 384 U.S. 436 (1966), was a watershed decision in effectuating this constitutional guarantee. The Court's majority noted the history of widespread physical and psychological practices that were used to induce involuntary confessions, concluding that "[u]nless a proper limitation upon custodial interrogation is achieved—such as these decisions will advance—there can be no assurance that practices of this nature will be eradicated in the foreseeable future." *Id.* at 447.

¶54         The actual holding in *Miranda* is that "the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." *Id.* at 467. But the 5–4 majority also concluded that "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.* To avoid such coercive pressure, "the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." *Id.*

¶55         The Court emphasized that "we cannot say that the Constitution necessarily requires adherence to any particular solution," nor does the decision "create[] a constitutional straitjacket which will handicap sound efforts at reform." *Id.* But until it was shown alternatives "which are at least as effective in apprising accused persons of their right of silence and in assuring a continuous opportunity to exercise it," certain procedures must be observed. *Id.* These procedures consist of the now-familiar "*Miranda* warning" and rules, which the Court summarized as follows:

> [W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, . . . [h]e must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and

21

> intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

*Id.* at 478–79.

**¶56**          In dissent, Justice Clark warned that the creation of "[s]uch a strict constitutional specific inserted at the nerve center of crime detection may well kill the patient," *id.* at 500 (Clark, J., concurring in the result and dissenting in part), and accused the majority of "in one full sweep changing the traditional rules of custodial interrogation which this Court has for so long recognized as a justifiable and proper tool in balancing individual rights against the rights of society," *id.* at 503. Justice White, joined by Justices Harlan and Stewart, declared that the majority's ruling "makes very little sense in terms of the compulsion which the Fifth Amendment proscribes. . . . Confessions and incriminating admissions, as such, are not forbidden evidence; only those which are compelled are banned." *Id.* at 536 (White, J., dissenting).

**¶57**          Regardless of the dissenters' concerns, over the course of the ensuing six decades, *Miranda* has surely greatly curtailed the coercive practices that gave rise to both the Fifth Amendment and the decision itself. Indeed, the *Miranda* warning is so deeply ensconced in the public consciousness that most Americans probably could recite it even without the benefit of a civics class, so long as they watch crime shows on television. And, of course, police interrogation practices and transparency have evolved greatly since that decision.

**¶58**          But at the same time, as this Court's review of the applicable precedents today evidences, enforcement of the Fifth Amendment's guarantee against self-incrimination has been eclipsed by compliance with the *Miranda* rules as ends in themselves, with the deleterious yet predictable result that legitimate law enforcement practices that do not produce coerced confessions are sometimes nonetheless subject to exclusion at trial.

**¶59**          This distinction between *Miranda*'s holding and its implementing rules was expressly recognized and accorded significance in *Michigan v. Tucker*, 417 U.S. 433 (1974). During a custodial interrogation of

a suspect before the Court issued its *Miranda* decision, the suspect identified a witness before he was advised that he had the right to appointed counsel. *Id.* at 436–37. The Supreme Court determined that the witness's testimony did not have to be excluded. *Id.* at 452.

**¶60** The Court first considered "whether the police conduct complained of directly infringed upon respondent's right against compulsory self-incrimination or whether it instead violated only the prophylactic rules developed to protect that right." *Id.* at 439. Looking at the constitutional right, the Court found that the "evils at which it was to strike" involved forced confessions, so that pre-*Miranda* decisions focused on whether confessions were voluntary. *Id.* at 440–41. By contrast, the Court in *Miranda* recognized that the "procedural safeguards" it set forth "were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected." *Id.* at 444 (citing *Miranda*, 384 U.S. at 467). The Court noted that "no one could contend that the interrogation faced by respondent bore any resemblance to the historical practices at which the right against compulsory self-incrimination was aimed." *Id.* Although the full panoply of *Miranda* warnings were not provided, the Court declared that "when balancing the interests involved, we must weigh the strong interest under any system of justice of making available to the trier of fact all concededly relevant and trustworthy evidence which either party seeks to adduce." *Id.* at 450. Under the circumstances the case presented, the Court ruled in favor of allowing the testimony. *Id.* at 452.

**¶61** But any hope that the Court would elevate constitutional substance over jurisprudential form proved short-lived. In addition to *Doyle* and other decisions applying *Miranda*'s prophylactic rules, the Supreme Court further confused matters in *Dickerson v. United States*, 530 U.S. 428 (2000). There the Court considered an act of Congress, enacted ostensibly pursuant to its enforcement powers under Section 5 of the Fourteenth Amendment, providing that admissibility of a defendant's statements made in custodial interrogations would depend on their voluntariness. *Id.* at 431–32.

**¶62** Previously, the Supreme Court held in *City of Boerne v. Flores*, 521 U.S. 507, 535–36 (1997), that Congress may not use its Section 5 enforcement authority to supersede the Court's decisions interpreting and applying the Constitution. The Court in *Dickerson* acknowledged that

23

"Congress retains the ultimate authority to modify or set aside any judicially created rules of evidence and procedure that are not required by the Constitution," 530 U.S. at 437, and conceded "that there is language in some of our opinions that supports the view" that *Miranda*'s prophylactic rules were not constitutionally mandated, *id.* at 438. The Court grounded its hegemony over the subject matter, to the exclusion of Congress, in its supervisory authority over federal courts and in the fact that it had consistently applied the decision to the states—therefore, it must have been a constitutional decision. *Id.* at 437–38.

¶63 Thus, the Court justified its authority to impose prophylactic rules on the states not because of a constitutional violation but on the basis that it had previously done so. And it completely elided the distinction it had consistently drawn, starting with *Miranda* itself, between the *holding* in that case, which *was* constitutionally based, and the rules it set forth to implement that holding, which were *not* constitutionally based.

¶64 The *Dickerson* majority never exactly said that the *Miranda* rules were constitutionally mandated, but instead that they have "constitutional underpinnings." *Id.* at 440 n.5. Presumably, everything the Court does has constitutional underpinnings so long as it is acting under its Article III authority, which it does when it holds a law unconstitutional, as opposed to exceeding those powers by, say, legislating.

¶65 Given logical holes of such enormous girth, Justice Scalia (joined in dissent by Justice Thomas) could not resist spotlighting them. Scalia observed that even though the Court invalidated the statute, the majority never expressly stated that the congressional enactment violated the Constitution. "The reason the statement does not appear is not only . . . that it would be absurd, inasmuch as [the statute] excludes from trial precisely what the Constitution excludes from trial, viz., compelled confessions; but also that Justices whose votes are needed to compose today's majority are on record as believing that a violation of *Miranda* is *not* a violation of the Constitution."[3] *Id.* at 445 (Scalia, J., dissenting) (emphasis in original). The "only thing that can possibly mean," Scalia charged, "is

---

[3] Indeed, Chief Justice Rehnquist, who authored *Dickerson*, also authored *Michigan v. Tucker*, which, as noted *supra* ¶¶ 59–60, was premised on precisely the opposite conclusion. *See Dickerson*, 530 U.S. at 451 (Scalia, J., dissenting).

24

that this Court has the power, not merely to apply the Constitution but to expand it, imposing what it regards as useful 'prophylactic' restrictions upon Congress and the States. That is an immense and frightening antidemocratic power, and it does not exist." *Id.* at 446.

¶66 Turning to the *Miranda* rules themselves, Scalia observed that what makes them "unacceptable as a matter of straightforward constitutional interpretation" is their "palpable hostility toward the act of confession *per se*, rather than toward what the Constitution abhors, *compelled* confession." *Id.* at 450 (emphasis in original). Apropos of the case before us, the "Constitution is not, unlike the *Miranda* majority, offended by a criminal's commendable qualm of conscience or fortunate fit of stupidity." *Id.*

¶67 Much as I agree with Justice Scalia, were *Dickerson* the Supreme Court's final word on the subject, I would not have cause to write separately in this case. We would have to accept that *Miranda* is constitutionally mandated in its totality and constrain ourselves to conscientiously parsing the precedents applying its many dimensions, as the Court has done here. *See Dickerson*, 530 U.S. at 432 (holding that "*Miranda* and its progeny . . . govern the admissibility of statements made during custodial interrogation in both state and federal courts.").

¶68 But remarkably, the Supreme Court reversed itself on this question yet again in *Vega v. Tekoh*. Presented in that case was the question of whether a police interrogation of a suspect without a *Miranda* warning gives rise to a claim for damages under 42 U.S.C. § 1983. *Vega*, 597 U.S. at 138. That majestic statute provides a cause of action for violations of rights "secured by the Constitution and laws" under color of state law. *Id.* at 141. It typically provides a remedy for violations of the Fourteenth Amendment and provisions of the Bill of Rights that are incorporated through that amendment to the states. *See, e.g.*, *Monroe v. Pape*, 365 U.S. 167, 172 (1961), *overruled in part on other grounds by Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

¶69 The Court held in *Vega* that the failure to provide the *Miranda* warning did not give rise to a § 1983 claim because the rules are *not* mandated by the Constitution. 597 U.S. at 150. Putting a fine point on it, the Court remarked that "[i]f a *Miranda* violation were tantamount to a violation of the Fifth Amendment, our answer would of course be

25

different." *Id.* at 141. The Court recounted many cases in which it had distinguished between *Miranda*'s constitutional holding and its implementing rules, upholding actions that violated the latter but conformed to the former, *id.* at 144–46, before concluding that "a violation of *Miranda* is not itself a violation of the Fifth Amendment," *id.* at 152. For the moment, at least, that is the Supreme Court's final pronouncement on the subject.

## C.

¶70 So how do state courts untangle this jurisprudential pretzel? By virtue of the Supremacy Clause, U.S. Const. art. VI, cl. 2, we are bound by the Supreme Court's interpretation of the federal constitution and laws; but under principles of federalism, unlike federal courts that are subject to the Supreme Court's supervisory authority, we are not otherwise bound by its decisions. What do we do with a constitutional ruling that does not enforce a constitutional right?

¶71 "In our federalist system of dual sovereignty, states retain certain antecedent powers, including the power to protect their citizens from crime." *Simpson v. Miller*, 241 Ariz. 341, 345 ¶ 8 (2017); *see also Bond v. United States*, 572 U.S. 844, 848 (2014) (noting that "our constitutional structure leaves local criminal activity primarily to the States"). The states' authority may be supplanted only by constitutional guarantees and valid federal statutes. *Cf. Bond*, 572 U.S. at 858 (noting that the Supreme Court applies federalism principles by construing federal statutes, when possible, to avoid imposing obligations under Section 5 of the Fourteenth Amendment or to preempt state laws). Even then, the Supreme Court has "repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest." *United States v. Salerno*, 481 U.S. 739, 748 (1987).

¶72 *Dickerson* itself acknowledged that "[i]t is beyond dispute that we do not hold a supervisory power over the courts of the several States." 530 U.S. at 438. "With respect to proceedings in state courts, our 'authority is limited to enforcing the commands of the United States Constitution.'" *Id.* (quoting *Mu'Min v. Virginia*, 500 U.S. 415, 422 (1991)).

¶73 In *Vega*, the Court explained that *Dickerson* essentially proclaimed that the *Miranda* rules have the status of a law of the United

States that is binding on the states under the Supremacy Clause—which Justice Alito, writing for the *Vega* majority, aptly characterized as "a bold and controversial claim of authority."[4]  597 U.S. at 149 & n.5.  Of course, judicial creation of such a law, as Justice Scalia correctly depicted it, "flagrantly offends fundamental principles of separation of powers." *Dickerson*, 530 U.S. at 454 (Scalia, J., dissenting).  On closer inspection, though, *Dickerson* actually based its imposition of the *Miranda* rules on the states on the fact that the Court had done so since *Miranda*—reasoning circularly that *Miranda* must have announced a constitutional rule because that decision "and two of its companion cases applied the rule to proceedings in state courts," *id.* at 438 (majority opinion)—and now that practice was protected by stare decisis, *id.* at 443–44.  In reality, the Supreme Court has *never* articulated a constitutional basis for imposing *Miranda*'s prophylactic rules on the states.

¶74        Indeed, Justice Stevens, who joined the *Dickerson* majority, urged elsewhere that "[t]his Court's power to require state courts to exclude probative self-incriminatory statements rests entirely on the premise that the use of such evidence violates the Federal Constitution."  *Oregon v. Elstad*, 470 U.S. 298, 370 (1985) (Stevens, J., dissenting).  "If the Court does not accept that premise," Justice Stevens continued, "it must regard the holding in the *Miranda* case itself, as well as all of the federal jurisprudence that has evolved from that decision, as nothing more than an illegitimate exercise of raw judicial power."  *Id.* at 371.  Justice Scalia amplified that point in his *Dickerson* dissent, stating that "our continued application of the *Miranda* code to the States despite our consistent statements that running afoul of its dictates does not necessarily—or even usually—result in an

---

[4] Legal scholars, including one who is now a member of the Supreme Court, have voiced similar concerns.  *See, e.g.*, Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L. Rev. 109, 174 (2010) (Remarking that legal textualists "have emphatically rejected the proposition that federal courts may adopt doctrinal tests that overenforce the Constitution by imposing limits on state actors that go beyond those set by the document itself.  The dispute over the constitutional status of *Miranda* warnings is the most well-known example" (footnote omitted)); Joseph D. Grano, *Prophylactic Rules in Criminal Procedure: A Question of Article III Legitimacy*, 80 Nw. U. L. Rev. 100, 124 (1985) ("[F]ederalism and separation of power considerations should . . . temper our zeal for attributing by implication what [A]rticle III does not convey in explicit terms.").

actual constitutional violation, represents not the source of *Miranda*'s salvation but rather evidence of its ultimate illegitimacy." *Dickerson*, 530 U.S. at 456 (Scalia, J., dissenting).

¶75 Now that *Vega* has definitively established that "a violation of *Miranda* is not itself a violation of the Fifth Amendment," 597 U.S. at 152, I see no basis whatsoever to reflexively follow the prophylactic rules. It may be that they are independently required by the Arizona Constitution, laws, or court rules, or that they constitute voluntary best practices. But I believe that Arizona is free to chart its own course, so long as we scrupulously protect the constitutional right against self-incrimination.

¶76 As to my colleague Chief Justice Timmer's concurrence, her recitation of what the Supreme Court said in *Vega* is entirely correct. But try as it might, the Court cannot make one plus one equal three. That Court has stated—consistently, clearly, and categorically—that its constitutional rulings can bind the states only when demanded by the Constitution. *Supra* ¶¶ 70–75. Just as plainly, *Vega*'s holding is that *Miranda*'s prophylactic rules are not commanded by the Fifth Amendment. *Vega*, 597 U.S. at 149. We are bound only by the Supreme Court's constitutional holdings, not (as contrasted with the federal courts) by its prophylactic rulemaking, nor by its musings about what a prior opinion (*Dickerson*) was purported to have done through its hitherto unknown legislating authority. Even taking a broad view of *Miranda*, and *Vega*'s reluctance to overturn it even as it disavowed the constitutional authority for its prophylactic rules, I believe the states have wide latitude to determine their rules and procedures to effectively enforce the Fifth Amendment's right against self-incrimination.

¶77 Indeed, *Miranda* itself noted that policymakers permissibly may implement different procedures that are "at least as effective in apprising accused persons of their right of silence and in assuring a continuous opportunity to exercise it." 384 U.S. at 467. It may well be that the widespread use of videotaped custodial interviews, coupled with a warning advising the suspect of the right to remain silent, would satisfy even *Miranda*, and could certainly assure that no Fifth Amendment violation occurs.

¶78 Beyond that, and to the case before us, Arizona may wish to warn suspects that their silence *may* be used against them in certain

circumstances. In England, for instance, from which our cherished protection against self-incrimination derives, evidence of silence is permissible at trial although neither the prosecutor nor court may comment on it. Gordon Van Kessel, *The Suspect as a Source of Testimonial Evidence: A Comparison of the English and American Approaches*, 38 Hastings L.J. 1, 6 (1986). Certainly, as in the case here, silence or selective silence may be probative evidence depending on the totality of circumstances. Such an approach would avoid the *Doyle* conundrum in which due process concerns emanate not from the right against self-incrimination but "implicitly" from "what the State is required to advise the person arrested." 426 U.S. at 617.

¶79 At the same time, the Arizona Constitution may in certain instances provide *greater* protections for criminal suspects and defendants than does its federal counterpart. *See, e.g.*, *State v. Ault*, 150 Ariz. 459, 464–65 (1986) (rejecting the federal inevitable discovery doctrine); *State v. Bolt*, 142 Ariz. 260, 264–65 (1984) (holding that warrantless home entry is per se unlawful absent exigent circumstances); *State v. Mixton*, 250 Ariz. 282, 306 ¶ 114 (2021) (Bolick, J., dissenting) (contending that the private affairs clause provides greater protection against warrantless searches than the Fourth Amendment); *see generally* Clint Bolick, *Principles of State Constitutional Interpretation*, 53 Ariz. St. L.J. 771, 778 & n.40 (2021).

¶80 Following *Miranda*'s prophylactic rules sixty years later, at a time in which the abuses to which they were directed have largely receded and in which transparency of the arrest and interrogation process has greatly expanded, is no minor imposition. As the Supreme Court acknowledged in *Dickerson*, the "disadvantage of the *Miranda* rule is that statements which may be by no means involuntary, made by a defendant who is aware of his 'rights,' may nonetheless be excluded and a guilty defendant go free as a result." 530 U.S. at 444. Were this Court to rule differently than it does today, with procedural form predominating over constitutional substance, that would be exactly the result here, as there is no evidence of coercion.

¶81 I realize it is a bit of a Yogi Berra-ism,[5] but I cannot make the point more plainly than this: there is no constitutional violation unless there

___

[5] Yogi Berra was the legendary New York Yankees' catcher (winning more World Series Championships than any other player), manager, and coach,

is a constitutional violation. The Supreme Court has clearly instructed that a violation of the rules is not a violation of the Constitution. In cases involving the right against self-incrimination, that right, and whether it was protected or violated, should be our exclusive focus.

---

who often turned out memorable quotes, spanning the obvious ("It ain't over 'til it's over.") to the incomprehensible ("Ninety percent of the game is half mental."). *See* Yogi Berra, *The Yogi Book: I Really Didn't Say Everything I Said!* (1999).

TIMMER, C. J., concurring.

**¶82**     I join the Court's opinion in full.  I write separately to address Justice Bolick's suggestion in his concurrence that we should assess the voluntariness of a confession without regard to *Miranda*'s requirement that procedural safeguards—for example, advising people they have a right to remain silent and the right to an attorney—must be in place to protect the Fifth Amendment privilege against compelled self-incrimination during custodial interrogation.  *See supra* ¶ 47; *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  He reasons we are not bound by *Miranda*'s decision regarding these safeguards because they "exceed the U.S. Supreme Court's authority with regard to state criminal proceedings and procedures."  *See supra* ¶ 47; *see also supra* ¶ 51 (asserting that states are bound only by constitutional guarantees and not "the prophylactic rules the Supreme Court has articulated to direct their enforcement").  As always, Justice Bolick has penned a thoughtful and elegantly written analysis.  But I cannot let pass his assertion that this Court may "chart its own course" away from *Miranda*, *see supra* ¶ 75, without stressing that the authority of the U.S. Supreme Court over matters of federal constitutional law is not a matter of state discretion, and adherence to its precedent is not optional.

**¶83**     The Supreme Court has repeatedly said that states are bound to apply *Miranda*'s requirement that law enforcement provide warnings to a suspect to safeguard against compelled self-incrimination.  *See Dickerson v. United States*, 530 U.S. 428, 438–39 (2000) (concluding that *Miranda*'s protections are constitutionally required and listing numerous cases in which the Supreme Court has applied the rule to state court proceedings).  In *Vega v. Tekoh*, 597 U.S. 134 (2022), which Justice Bolick relies on, *see supra* ¶¶ 68–69, the Court left the *Miranda* warnings intact as the governing rule for custodial interrogations in state and federal courts.  Justice Alito, who authored the majority opinion, described *Dickerson* as concluding that the *Miranda* rule "has the status of a Law of the United States that is binding on the States under the Supremacy Clause."  *Id.* at 149 (cleaned up).  Although recognizing that "[w]hether [the] Court has the authority to create constitutionally based prophylactic rules that bind both federal and state courts has been the subject of debate among jurists and commentators," Justice Alito accepted that this is "what the Court did in *Miranda*," and his opinion in *Vega* "[did] not disturb that decision in any way."  *Id.* at 149 n.5.  Thus, far from undermining *Miranda*, *Vega* reaffirmed

its status as binding precedent under the Supremacy Clause, leaving no room for lower courts to unilaterally discard its safeguards.

**¶84**      Justice Bolick raises many excellent points, and *Vega* may foreshadow the Supreme Court's step down a path that leads to *Miranda*'s demise.  But not yet.  As stated by the Supreme Court, "[if] a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).  Adhering to this hierarchical judicial authority is not "reflexive," *see supra* ¶ 75, but reinforces the stability and integrity of the judicial system by respecting the Supremacy Clause.

**¶85**      Following the *Miranda* framework is not a matter of choice; it is a constitutional imperative.  Until the Supreme Court speaks otherwise, our role is not to predict its trajectory but to uphold the law as it stands.